# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-01296-COA

**MARY MARGARET UPCHURCH AND RICKIE UPCHURCH**                    APPELLANTS

v.

**ADAM I. LEWIS, M.D. AND JACKSON NEUROSURGERY CLINIC, PLLC**                    APPELLEES

| | |
|---|---|
| DATE OF JUDGMENT: | 07/12/2023 |
| TRIAL JUDGE: | HON. M. BRADLEY MILLS |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | JOSEPH E. ROBERTS JR. |
| | CRYMES MORGAN PITTMAN |
| | ANN RUSSELL CHANDLER |
| ATTORNEYS FOR APPELLEES: | L. CARL HAGWOOD |
| | DAVID MARK EATON |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | REVERSED AND REMANDED - 09/23/2025 |
| MOTION FOR REHEARING FILED: | |

## CONSOLIDATED WITH

## NO. 2024-CA-00396-COA

**ADAM I. LEWIS, M.D. AND JACKSON NEUROSURGERY CLINIC, PLLC**                    APPELLANTS

v.

**MARY MARGARET UPCHURCH AND RICKIE UPCHURCH**                    APPELLEES

| | |
|---|---|
| DATE OF JUDGMENT: | 02/21/2024 |
| TRIAL JUDGE: | HON. M. BRADLEY MILLS |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | L. CARL HAGWOOD |
| | DAVID MARK EATON |

ATTORNEYS FOR APPELLEES:      JOSEPH E. ROBERTS JR.
                               CRYMES MORGAN PITTMAN
                               ANN RUSSELL CHANDLER

NATURE OF THE CASE:        CIVIL - MEDICAL MALPRACTICE
DISPOSITION:                 AFFIRMED - 09/23/2025
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., McCARTY AND WEDDLE, JJ.**

**WEDDLE, J., FOR THE COURT:**

¶1.     Mary Margaret Upchurch suffered paralysis in her legs following a surgery performed at Merit Health Rankin by Dr. Adam Lewis, a neurosurgeon with Jackson Neurosurgery Clinic PLLC (Jackson Neurosurgery).  Mary and her husband, Rickie, filed a medical-malpractice lawsuit in the Rankin County Circuit Court against multiple defendants, including Dr. Lewis, Jackson Neurosurgery, and Merit Health Rankin.  After settling their claims against Merit Health Rankin, the Upchurches proceeded to trial against only Dr. Lewis and Jackson Neurosurgery.

¶2.     A Rankin County Circuit Court jury found that Dr. Lewis was not negligent in his care and treatment of Mary and returned a verdict in favor of Dr. Lewis and Jackson Neurosurgery.  The circuit court entered a judgment on the verdict and dismissed with prejudice all charges against Dr. Lewis and Jackson Neurosurgery.  The circuit court subsequently entered an order denying the Upchurches' post-trial motion for judgment notwithstanding the verdict (JNOV) or, alternatively, a new trial.

¶3.     In appellate case number 2023-CA-01296-COA, the Upchurches appeal from the jury verdict, the circuit court's final judgment, and the circuit court's order denying their post-trial motions.  The Upchurches argue that the circuit court erred by (1) failing to grant their

motion for a directed verdict as to the liability of Merit Health Rankin's nursing staff; (2) failing to grant their motion for JNOV or, alternatively, a new trial; and (3) improperly instructing the jury.

¶4. After the Upchurches designated the record for appeal, Dr. Lewis and Jackson Neurosurgery sought to include over forty additional documents in the appellate record. The estimated costs of the appeal for the additional documents Dr. Lewis and Jackson Neurosurgery sought to include exceeded $30,000. The Upchurches disputed the need for all the documents and asked the circuit court to assess the costs of any additional appellate record designations to Dr. Lewis and Jackson Neurosurgery. The circuit court granted the Upchurches' motion to assess the costs of the amended designation to Dr. Lewis and Jackson Neurosurgery but also granted them leave to submit another amended designation of the record for appeal if they wished to do so. In appellate case number 2024-CA-00396-COA, Dr. Lewis and Jackson Neurosurgery appeal from the order assessing the costs of the amended designation of the appellate record to them. Because the two appeals stem from the same underlying matter, this Court has consolidated the appeals.

¶5. Upon reviewing the issues raised in appellate case number 2023-CA-01296-COA, we find, in light of the substantial credible evidence the Upchurches presented through their fact and expert witnesses, there was insufficient evidence to support the jury's verdict in favor of Dr. Lewis and Jackson Neurosurgery. Dr. Lewis's own testimony constituted the only evidence that the medical device he implanted during Mary's surgery was compatible with another manufacturer's previously implanted medical device and that his decision to "mix

3

and match" different manufacturers' medical equipment complied with the standard of care.

¶6.    After reviewing the record, we cannot find that Dr. Lewis was ever tendered or accepted as an expert witness, and any testimony he gave regarding the standard of care was improperly admitted.  Dr. Lewis was the sole witness to testify that mixing and matching different manufacturers' medical equipment complied with the standard of care.  By contrast, the Upchurches presented multiple expert witnesses who testified that performing Mary's surgery with only a different manufacturer's medical device available breached the standard of care.  In light of this and the substantial evidence that the Upchurches provided as to the standard of care and Dr. Lewis's negligence in causing Mary's injuries, we find that insufficient evidence supported the jury's verdict.  As a result, we conclude that the circuit court erred by denying the Upchurches' post-trial motion for JNOV.

¶7.    We therefore reverse the circuit court's judgment and the jury's verdict in favor of Dr. Lewis and Jackson Neurosurgery and remand the case for a new trial.  Because we find this issue dispositive, we decline to address the Upchurches' remaining arguments on appeal in appellate case number 2023-CA-01296-COA.  In appellate case number 2024-CA-00396-COA, we find no error in the circuit court's order assessing the costs of an amended designated appellate record to Dr. Lewis and Jackson Neurosurgery.  We therefore affirm the circuit court's order at issue in Dr. Lewis and Jackson Neurosurgery's consolidated appeal.

**FACTS**

¶8.    Mary suffered from severe fibromyalgia and chronic back pain.  In 2009, she underwent surgery to have a spinal cord stimulator manufactured by St. Jude Medical Inc.

4

(St. Jude)[1] implanted to provide relief from the pain. The spinal cord stimulator was powered by a battery that St. Jude also manufactured. The two system components were connected by leads that ran from the spinal cord stimulator and plugged into the battery, also referred to as an implantable pulse generator. To provide Mary with relief from her pain, the battery was supposed to send an electrical current through the leads that connected to the spinal cord stimulator. Unfortunately, the St. Jude spinal cord stimulator provided inadequate relief for Mary's back pain. As a result, in 2011, Mary underwent another procedure to have a pain pump implanted. The pain pump delivered small doses of pain-relieving medicine directly into Mary's spinal cord, which finally began to provide her with adequate relief.

¶9. In 2014, the Upchurches moved to Mississippi. In September 2015, Mary had surgery to replace the original St. Jude battery connected to her spinal cord stimulator with a new St. Jude battery. At trial, Rickie testified that after the September 2015 surgery to replace the original battery, the spinal cord stimulator finally began providing Mary with noticeable pain relief. In the spring of 2016, the Upchurches learned during a visit to Mary's doctor that her pain pump would need to be replaced soon. Mary's physician referred her to Dr. Lewis for the replacement of the pain pump.

¶10. At trial, the Upchurches called Dr. Lewis to testify as an adverse fact witness during their case-in-chief. Though he was never offered or accepted as an expert medical witness in any field, Dr. Lewis testified about the care and treatment he provided to Mary. Dr. Lewis

---

[1] Throughout the opinion, we refer to St. Jude Medical Inc. as "St. Jude" for readability and not to indicate any other entities, such as St. Jude Children's Research Hospital.

stated that during his consultation with the Upchurches, he discussed replacing Mary's current pain pump with a pain pump manufactured by Boston Scientific. According to Rickie's testimony, although there were serious risks associated with replacing the pain pump, Mary was willing to undergo the procedure due to the significant benefits and relief she received from the pain pump. During the consultation, Dr. Lewis also asked the Upchurches about Mary's St. Jude spinal cord stimulator. Rickie testified that he and Mary told Dr. Lewis that they felt the St. Jude stimulator system was working well and providing Mary with fairly consistent pain relief after the surgery several months earlier to replace the battery. The Upchurches explained that their only complaint with the St. Jude system was that the battery seemed to take a long time to charge.

¶11.    Even though the Upchurches expressed an overall satisfaction with Mary's St. Jude system, Dr. Lewis testified that he recommended Mary switch to the spinal cord stimulator manufactured by Boston Scientific. Although Dr. Lewis stated that Todd Dyess, a Boston Scientific sales representative, joined in his consultation with the Upchurches, Dyess later testified that he had no recollection of any consultation with Dr. Lewis and the Upchurches. Regardless of Dyess's presence or absence at the consultation, Dr. Lewis stated that he recommended to the Upchurches that Boston Scientific's spinal cord stimulator would be an upgrade to Mary's current St. Jude model. Dr. Lewis explained that the Boston Scientific spinal cord stimulator only took fifteen minutes to charge and could be programmed to provide different types of stimulation to help reduce Mary's pain.

¶12.    In contrast to Dr. Lewis's testimony about the consultation, Rickie stated that his and

6

Mary's discussions with Dr. Lewis remained limited to the replacement of Mary's pain pump and her St. Jude battery. Rickie testified that they never discussed with Dr. Lewis replacing Mary's spinal cord stimulator or the leads that connected the spinal cord stimulator to the battery. In fact, Rickie testified that Dr. Lewis repeatedly assured the Upchurches the leads from Mary's St. Jude spinal cord stimulator would fit into the Boston Scientific Precision Spectra battery that he recommended to them. Rickie stated that even if the topic of replacing the leads or the stimulator had come up, he and Mary never would have consented to those procedures. Rickie explained that he and Mary felt the risks associated with replacing the leads or the stimulator outweighed any potential benefits of the procedures. As Rickie testified, "[Mary] already had significant benefit from the pain pump[,]" which they consented to replace despite the associated risks, and therefore, "[t]here was no reason in our minds to [also] accept the greater risks of moving the leads in her spine."

¶13. On June 15, 2016, Dr. Lewis performed Mary's surgery. Dr. Lewis removed Mary's St. Jude battery and replaced it with the Boston Scientific Precision Spectra battery. He then successfully connected the first lead from Mary's St. Jude spinal cord stimulator to the new battery. Dr. Lewis testified, however, that the second lead would not fit properly into the new battery. At various points throughout his testimony, Dr. Lewis described the second lead as irregularly shaped, bent, flimsy, and corroded. After he was unable to connect the second lead to the Boston Scientific battery, Dr. Lewis testified that someone was sent to Rickie in the waiting room to ask if Rickie wanted to stop Mary's procedure or give additional consent for the replacement of her spinal cord stimulator.

¶14.    The jury heard contradictory testimony as to what occurred when the hospital employee spoke to Rickie in the waiting room.  According to Dr. Lewis, Rickie's informed consent was obtained to replace Mary's spinal cord stimulator.  As a result, Dr. Lewis testified that he performed a laminectomy on Mary, which required him to remove a portion of Mary's spinal bone to access her spinal canal.  Dr. Lewis stated that he then replaced Mary's existing St. Jude stimulator with a Boston Scientific stimulator and completed the surgery.

¶15.    Rickie confirmed that a hospital employee approached him in the waiting room and informed him that there had been a problem fitting Mary's St. Jude stimulator leads into the new Boston Scientific battery.  Rickie stated that the employee asked if Rickie wanted Dr. Lewis "to put the leads in or . . . put in the new battery and . . . do whatever or just quit[.]" Rickie repeatedly testified that the employee never informed him that continuing surgery meant exposing Mary to greater risks by performing a laminectomy to replace Mary's current leads with more invasive paddles.  Rickie also testified that the employee never specifically discussed with him that replacing the leads to Mary's spinal cord stimulator with paddles posed the risk of paralysis.

¶16.    Rickie stated that he never received a phone call from either Dr. Lewis or his assistant regarding the progress or outcome of Mary's surgery.  In the afternoon, hospital personnel escorted Rickie to the post-anesthesia care unit (PACU), where Mary was recovering. Rickie testified that Mary's post-surgery recovery differed from her prior surgical experiences. Rickie explained that Mary woke up slowly and was "in a lot of pain[,]" which "usually

8

[was] not the case" after surgery. Rickie stated that he remained with Mary in the PACU and once she was transferred to her own hospital room.

¶17. After Mary was moved to a room, Rickie testified that she began to complain of numbness in her legs, particularly her left leg. A friend came to stay with Mary while Rickie left for about an hour. Rickie testified that upon returning to the hospital, he remained with Mary in her room until about 11:30 p.m. Rickie stated that although he had seen Dr. Lewis before Mary's procedure, he (Rickie) had no further communication with or contact from Dr. Lewis on the day of Mary's procedure.

¶18. For his part, Dr. Lewis testified that after Mary's surgery, he examined her in the PACU and entered a post-operative note around 5 p.m. to document his findings. Like Rickie, Dr. Lewis observed that Mary was slow to wake up from her surgery. Dr. Lewis also observed that Mary had a little weakness in her left leg and a little numbness below her left knee and in her left foot. Dr. Lewis acknowledged that "the first signs [of a hematoma, or a blood clot,] are numbness followed by weakness." Dr. Lewis explained that "when someone develops a hematoma in the spinal cord, it's not usually one sided." Rather, both sides of the body are affected. Dr. Lewis stated that when a hematoma forms after spinal surgery, the symptoms generally begin "with burning intense pain down the leg [that] progresses to . . . dense numbness, and then it goes to paralysis on both sides." Dr. Lewis maintained that when he examined Mary in the PACU, he only observed slight weakness and numbness on one side of her lower body. He explained that Mary's symptoms did not overly concern him at that time since he had just operated on the left side of her spinal cord. Dr.

9

Lewis further explained that he expected any issues Mary was experiencing to resolve within the next twenty-four hours.

¶19. Janet Bullock, who worked as the primary nurse on the surgical recovery floor at the time of Mary's transfer, testified that Mary arrived on her floor around 4:30 p.m. Around 5 p.m., Nurse Bullock entered a note stating that Mary could not move her left leg. Nurse Bullock's note further stated that although Mary had minimal movement in her right toes, Mary complained of numbness in both her right lower leg and foot. Nurse Bullock testified that Mary's condition "was highly irregular" and concerning. As a result, Nurse Bullock called Dr. Lewis to report her observations and ask what steps he wanted her to take with regard to Mary's care. During their telephone conversation, Dr. Lewis told Nurse Bullock to give Mary a steroid shot. Nurse Bullock evaluated Mary again around 6:30 p.m. and found that Mary's condition did not appear to have changed or improved after the steroid shot. At 7 p.m., Nurse Bullock finished her shift, and another nurse took over Mary's care and supervision.

¶20. Dr. Lewis testified that on the morning after Mary's surgery, he reexamined Mary around 7:15 a.m. At that time, Dr. Lewis noted that Mary's condition had worsened and that she was very weak in both legs. Based on his concern that Mary had developed a hematoma, Dr. Lewis took Mary back to surgery. Upon questioning, Dr. Lewis maintained that his findings when he examined Mary in the PACU had differed from the observations that Nurse Bullock made. Dr. Lewis stated that if he had observed paralysis on Mary's entire lower left side as Nurse Bullock's note had indicated, he either would have ordered a CAT scan or

10

taken Mary immediately back to surgery. Dr. Lewis testified that Mary's hematoma presented not as an immediate post-surgical complication but rather appeared to have developed gradually overnight.

¶21. During Mary's second surgery, Dr. Lewis discovered a large hematoma pressing down on her spinal cord. Dr. Lewis also discovered that Mary "had bleeding from every incision." Dr. Lewis stated that "[s]omething had happened where she had had some kind of reaction either to the anesthesia or medication that caused every incision in her body, from the pain pump, even the tract to connect the leads, . . . was bleeding and oozing." Dr. Lewis removed the blood clot and explored Mary's incisions. Dr. Lewis testified that although he consulted with both a hospitalist and a hematologist, they were unable to determine what caused Mary's surgical incisions to bleed.

¶22. Dr. Lewis stated that Mary initially seemed to improve after he removed the hematoma, but then her weakness eventually returned and increased. Due to Mary's renewed weakness and the bleeding around her incisions, Dr. Lewis took her to surgery for a third time. During the third surgery, Dr. Lewis did not find another hematoma or any other cause of Mary's weakness, and he attributed her condition to post-surgical swelling around her spinal cord.

¶23. The paralysis in Mary's legs failed to improve. In August 2018, the Upchurches filed a medical-malpractice lawsuit against Dr. Lewis, Jackson Neurosurgery, and Merit Health Rankin. Prior to trial, the Upchurches settled their claims involving Merit Health Rankin.

¶24. The Upchurches designated Dr. Narlin Beaty as an expert in not only general

11

neurosurgery but also the implantation, removal, and replacement of spinal cord stimulators, batteries, and leads. With no objection from Dr. Lewis, the circuit court accepted Dr. Beaty as an expert witness in these areas. Dr. Beaty testified that he practiced as a neurosurgeon and was familiar with spinal cord stimulators manufactured by Boston Scientific, St. Jude, and Medtronic. Dr. Beaty stated that he regularly performed surgeries that involved implanting, removing, and replacing these models and their batteries. Dr. Beaty also stated that he was familiar with the standard of care that existed in 2016 with regard to not only performing but also obtaining consent for the implantation of spinal cord stimulators, batteries, and leads.

¶25. During his testimony, Dr. Beaty discussed Dr. Lewis's characterization of Mary's St. Jude leads as "corroded." Dr. Beaty testified that although he had "seen lots of leads" during his practice, he had "never seen . . . rust or iron oxidation on a lead." Dr. Beaty explained that the leads "live in fat" inside the human body, "and generally[,] if you want to keep a piece of metal intact, you . . . oil it. You put oil on it, and so the fat from the human [body's] oil usually keeps them intact." In addition, Dr. Beaty noted that just nine months before Dr. Lewis operated on Mary, another surgeon had replaced Mary's St. Jude battery. Dr. Beaty testified that nothing from the prior surgeon's notes indicated there had been an issue with the condition of Mary's St. Jude leads at that time.

¶26. In Dr. Beaty's expert opinion, Dr. Lewis deviated from the standard of care owed to Mary in three ways. Specifically, Dr. Beaty stated that Dr. Lewis failed to be properly prepared for surgery, obtain proper informed consent for surgery, and properly communicate

12

with Merit Health Rankin's nursing staff after Mary's surgery. With regard to Dr. Lewis's preparedness for surgery, Dr. Beaty testified that Dr. Lewis should have ensured that a St. Jude representative was present and that the proper medical equipment was available when he began Mary's surgery. Dr. Beaty stated, "[T]he bottom line is, it's the surgeon's responsibility to ensure that the operating room, a representative[,] and all pieces along the chain are functional and that the equipment is present in order to provide surgery."

¶27. Dr. Beaty testified that a Boston Scientific adapter, known as the Precision S8 adapter, existed "to connect existing leads that otherwise do not fit . . . to the Boston Scientific [Precision Spectra] battery" and "to fix the problem that . . . Mrs. Upchurch and Dr. Lewis had . . . that day." Further testimony presented at trial reflected that Boston Scientific designed its Precision S8 adapter to connect the Precision Spectra battery with stimulator leads designed by other manufacturers, such as St. Jude. Even though Dr. Lewis offered testimony to contest whether Boston Scientific's Precision S8 adapter was available at the time he performed Mary's surgery, Dr. Beaty stated that the adapter's availability did not alter his opinion that Dr. Lewis deviated from the standard of care. Dr. Beaty testified that he knew of no way to make Boston Scientific's Precision Spectra battery compatible with St. Jude leads without an adapter. Dr. Beaty further opined that trying to connect a Boston Scientific battery to St. Jude leads was not only outside the directions-of-use information that Boston Scientific provided for its Precision Spectra battery but also fell below the standard of care. Dr. Beaty reiterated that the standard of care additionally required Dr. Lewis to have a St. Jude medical-device sales representative present for Mary's surgery so that the

13

representative could assist with any equipment-related issues that arose.

¶28. Dr. Beaty concluded that Dr. Lewis "ended up doing more surgery because he was not prepared for the planned surgery[,] and unfortunately for Mrs. Upchurch[,] that additional surgery cost her a great deal of neurological function and changed the quality of her life." He stated that if Dr. Lewis "had the appropriate battery, then the additional surgery would not have been necessary[,] and the complication would not have happened." In addition to the mid-surgery complication, Dr. Beaty concluded that the initial surgery Dr. Lewis performed "caused compression of [Mary's] spinal cord" and "a hematoma[,] which . . . then [had to be] evacuated the following morning."

¶29. Dr. Beaty also testified regarding the ways he believed Dr. Lewis deviated from the standard of care in obtaining informed consent prior to Mary's surgery, handling the mid-surgery complication that arose, and communicating with Merit Health Rankin's nursing staff after surgery. Dr. Beaty stated Dr. Lewis's post-operative note demonstrated that Mary had "a small but present neurologic deficit[,]" and several notes from the nursing staff "document[ed] a large neurologic deficit." Dr. Beaty testified that other than ordering steroids for Mary, which was inadequate, no other steps were taken to address the neurologic deficit. According to Dr. Beaty, the communication failure between Dr. Lewis and the nursing staff also led to Mary's poor outcome after surgery.

¶30. In addition to Dr. Beaty, the Upchurches designated Dr. Stephen Bloomfield, a neurosurgeon and academic professor, as a second expert witness in the implantation and replacement of spinal cord stimulators, leads, and batteries. Again, without any objection

14

from Dr. Lewis, the circuit court accepted Dr. Bloomfield as an expert witness in these designated fields. Like Dr. Beaty, Dr. Bloomfield opined that Dr. Lewis deviated from the standard of care and failed to appropriately prepare for surgery when he operated on Mary without having the Boston Scientific Precision S8 adapter available. According to Dr. Bloomfield:

> [t]he standard of care would have dictated that the contact points needed to be tested with a proper system. And if [Dr. Lewis] did not prepare that proper system by [having] an S8 adapter prior to the separation, then he would have had to close the operation and then make plans to get that adapter to be able to perform that function.
>
> An alternative would have been for him to use the old battery that he was removing to test this[,] but he would have required the programmer from the old battery company from St. Jude[,] and he did not have that presence. So he would need to connect the old battery again and then run those diagnostics to see whether or not the electrode needed to be fixed or not.

¶31. Dr. Bloomfield further agreed with Dr. Beaty's opinion that Dr. Lewis deviated from the standard of care after examining Mary in the PACU following her initial surgery. Dr. Bloomfield stated that based on Dr. Lewis's post-operative progress note, "there was a significant suspicion that [Mary] was experiencing a compromise in function of her spinal cord into the thoracic spine." Dr. Bloomfield explained, "Dr. Lewis had come to see [Mary] because of that suspicion. He examined her, found some findings that were abnormal[,] and then placed her on steroids . . . in the effort to reduce the irritation of the spinal cord hoping that that would help her spinal cord function recover." Dr. Bloomfield testified, however, that the standard of care requires "that whenever a patient has a new neurological problem after surgery that can only be explained as a possible complication of the surgery[,] then an

15

imaging study is necessary emergently . . . to prove if there is pressure against the spinal cord as she did have later on the next day." Dr. Bloomfield stated that taking such measures would give a patient who experienced pressure to his or her spinal cord the best chance for recovery.

¶32. On cross-examination, Dr. Bloomfield again testified that the St. Jude leads were incompatible with the Boston Scientific Precision Spectra battery. Although Dyess, Boston Scientific's sales representative, had stated that he did not know if the Precision S8 adapter was available at the time of Mary's surgery, Dr. Bloomfield explained "that if the S8 adapter was requested prior to the surgery[,] it would have been made available." And like Dr. Beaty, Dr. Bloomfield opined that "[i]f the S8 adapter was not available despite asking for it to begin with, then it would be a violation of the standard of care to try to place the St. Jude electrodes into a Boston Scientific battery that was not compatible with those leads."

¶33. The Upchurches also called Dyess as a fact witness during their case-in-chief. At the time of Mary's surgery, Dyess worked as a Boston Scientific medical-device sales representative, and his sales territory included Mississippi. Dyess stated that in June 2016, he had not been trained on and was not familiar with the Boston Scientific Precision S8 adapter. Dyess testified, however, that he never made off-label recommendations or those not approved by the Federal Drug Administration to doctors and patients. As a result, Dyess specifically denied ever representing to patients or physicians that a Boston Scientific battery would be compatible with St. Jude leads.

¶34. Although Dyess was present during Mary's surgery, he refuted Dr. Lewis's earlier

16

testimony that he (Dyess) had been present during the pre-surgical consultation between Dr. Lewis and the Upchurches. Because he was present during Mary's surgery, Dyess knew that Dr. Lewis had trouble fitting one of Mary's St. Jude leads into the Boston Scientific battery. Dyess stated, though, that he was not close enough to the operating table to clearly see the reason for the difficulty. Dyess testified that from his vantage point, one of Mary's leads appeared to fit into the Boston Scientific battery, while the other lead only partially fit into the new battery. Dyess stated that to the best of his knowledge, he did not remember seeing a corroded lead as Dr. Lewis had earlier testified.

¶35. By agreement, the parties played for the jury the videotaped deposition of Ranjan Nageri, who served as Boston Scientific's designated corporate representative under Mississippi Rule of Civil Procedure 30(b)(6). Nageri stated that he had worked at Boston Scientific for thirteen years, had an engineering background, held patents on several medical devices related to neurostimulation, and was familiar with the spinal cord stimulator systems that Boston Scientific manufactured and sold. Nageri testified that he was also familiar with the directions-for-use booklet that Boston Scientific had published on its Precision Spectra system. The Upchurches entered the Precision Spectra's directions-for-use booklet into evidence as an exhibit during Nageri's testimony. Boston Scientific's directions-for-use booklet on the Precision Spectra system reflected a copyright date of 2015, which was over a year prior to the June 15, 2016 surgery that Dr. Lewis performed to connect Mary's St. Jude leads to the Precision Spectra battery.

¶36. During his video deposition, Nageri explained that the "Compatible Leads" section

of the directions-for-use booklet listed all the leads that Boston Scientific had tested and determined to be compatible with the Precision Spectra battery. Nageri confirmed that Boston Scientific designed and manufactured all the listed compatible leads. He further confirmed that Boston Scientific did not design the Precision Spectra system to be compatible with leads other than those specifically identified and that an adapter was required to make the Precision Spectra battery compatible with leads manufactured by St. Jude, Abbott, or Medtronic. Nageri stated that Boston Scientific designed the Precision S8 adapter to make its Precision Spectra battery compatible with St. Jude and Abbott leads. Similarly, Boston Scientific designed the Precision M8 adapter to make its battery compatible with Medtronic leads. According to Nageri, Boston Scientific had determined after conducting research analysis that the leads had "different dimensional characteristics, . . . and for them to be suitably mechanically and electrically compatible with [the battery], we would need an adapter." Nageri stated that he was uncertain when Boston Scientific's Precision S8 adapter had become available for use.

¶37. The parties (also by agreement) played the video deposition of Dr. Lewis's designated expert neurosurgery witness, Dr. Warren Neely. Dr. Neely represented that he was familiar with spinal cord stimulators, batteries, and pain pumps as well as the procedures related to those devices' implantation, replacement, and removal. He acknowledged, however, that about twenty years had elapsed since he last participated in a procedure involving the implantation of a spinal cord stimulator or battery. He further acknowledged that he had only assisted in the implantation of the spinal cord stimulator's paddles and not the implantation

18

of the spinal cord stimulator itself. Dr. Neely explained that because he did not perform such surgeries directly, he referred patients needing spinal cord stimulators or batteries to other physicians. Based on Dr. Neely's lack of personal experience with the implantation of spinal cord stimulators and batteries, the circuit court only allowed him to testify as an expert in general neurosurgery.

¶38. Dr. Neely opined that Dr. Lewis did not breach the standard of care owed to Mary in obtaining consent for and performing her surgery on June 15, 2016. Dr. Neely further opined that Dr. Lewis complied with the appropriate standard of care in his diagnosis and treatment of Mary after her initial surgery. Dr. Neely testified that a hematoma was a known risk of spinal surgery and that the development of one after Mary's surgery did not necessarily indicate that Dr. Lewis had breached the standard of care.

¶39. On cross-examination, Dr. Neely acknowledged that Mary had her St. Jude battery replaced in September 2015 without any compatibility issues arising. He further acknowledged that Mary's medical records indicated she was being referred to Dr. Lewis for the replacement of her pain pump. Dr. Neely agreed that if Dr. Lewis failed to explain to the Upchurches before surgery that Mary's leads might also need to be replaced during surgery, then that omission would have resulted in a deviation from the standard of care. In addition, Dr. Neely admitted that he had seen no consent form in his review of Mary's medical documents that specifically discussed the possibility of needing to replace Mary's leads during surgery.

¶40. In response to further questioning, Dr. Neely agreed that Dr. Lewis's own notes about

19

his pre-surgical consultation with the Upchurches appeared to indicate that Dr. Lewis was unsure if Mary's St. Jude leads would be compatible with the Boston Scientific Precision Spectra battery. While reiterating that he did not perform the type of surgery that Mary underwent, Dr. Neely acknowledged that not knowing before surgery if two types of systems are compatible "[c]ould be" a deviation from the standard of care for performing surgery.

¶41. After considering all the parties' testimony and evidence, the jury returned a verdict in favor of Dr. Lewis and Jackson Neurosurgery and found that Dr. Lewis was not negligent in his care and treatment of Mary. The circuit court denied the Upchurches' post-trial motion for JNOV or, alternatively, a new trial. Aggrieved, the Upchurches appealed from the jury's verdict and the circuit court's order denying their post-trial motions. After the Upchurches designated their appellate record, Dr. Lewis and Jackson Neurosurgery sought to amend the designation to include over forty additional documents. The estimated costs of the amended record designation requested by Dr. Lewis and Jackson Neurosurgery exceeded $30,000. The circuit court granted the Upchurches' request to assess the cost of an amended designation to Dr. Lewis and Jackson Neurosurgery but also granted Dr. Lewis and Jackson Neurosurgery leave to file another amended designation if they so chose. Aggrieved by the circuit court's order assessing the costs of the amended designation to them, Dr. Lewis and Jackson Neurosurgery also appealed. Because the two appeals stem from the same underlying matter, we consolidated them.

## DISCUSSION

I. **The Upchurches' Appeal**

¶42. At trial, Dr. Lewis was the only witness to testify that mixing and matching different manufacturers' medical equipment did not breach the standard of care. By contrast, the Upchurches presented substantial expert testimony to establish that Dr. Lewis's failure to use compatible medical equipment was one way in which he breached the standard of care and that his negligent care and treatment caused Mary's injuries. As a result, the Upchurches contend that legally insufficient evidence supported the jury's verdict finding Dr. Lewis was not negligent, and they challenge the circuit court's denial of their post-trial motion for JNOV.

¶43. Relevant to the Upchurches' argument, this Court has previously recognized that

> [a] motion for JNOV challenges the legal sufficiency of the evidence, and its grant or denial is reviewed de novo. The appellate court will affirm the denial of a JNOV motion if there is substantial evidence to support the verdict. Substantial evidence is evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions. The evidence will be considered in the light most favorable to the appellee, giving the party the benefit of all favorable inferences that may be reasonably drawn from the evidence.

*Weaver v. Ross*, 391 So. 3d 1240, 1247 (¶21) (Miss. Ct. App. 2024) (citations and internal quotation marks omitted).

¶44. "A physician is under a duty to meet the national standard of care." *Est. of Northrop v. Hutto*, 9 So. 3d 381, 384 (¶9) (Miss. 2009). "The standard articulated must be objective, not subjective." *Id.* Thus, an expert's "personal preference does not establish a national standard of care." *Id.* at 387 (¶13). In addition, Mississippi caselaw holds

> that a physician can testify without being accepted as an expert regarding: (1) the facts and circumstances surrounding the care and treatment of the patient; (2) what his records about the patient reveal; and (3) what conditions the

21

patient was suffering from if the opinion was acquired during the care and treatment of the patient. However, the [Mississippi S]upreme [C]ourt [has] cautioned that a physician cannot testify about the significance of a patient's condition or industry standards without first being accepted as an expert. We review a trial court's admission of testimony for an abuse of discretion.

*Kronfol v. Johnson*, 283 So. 3d 1162, 1178 (¶38) (Miss. Ct. App. 2019) (citations and internal quotation marks omitted). An error in admitting or excluding evidence "is prejudicial, and ground for reversal, only when it affects the final result of the case and works adversely to a substantial right of the party assigning it" as error. *Bell v. State*, 287 So. 3d 944, 961 (¶53) (Miss. Ct. App. 2019) (quoting *Gray v. State*, 799 So. 2d 53, 61 (¶30) (Miss. 2001)).

¶45. Here, the Upchurches indicated in the parties' pretrial order that they might call Dr. Lewis as a fact witness, and Dr. Lewis's attorneys indicated that they planned to call him as a fact and expert witness. However, the pretrial order constituted neither an acceptance by the circuit court nor a designation by Dr. Lewis's attorneys that Dr. Lewis was indeed an expert witness. In fact, as the dissent acknowledges, the appellate record contains no filing that actually designated Dr. Lewis as an expert witness.[2] *See post* at (¶58) & n.4. And

---

[2] In previously discussing the importance of properly designating expert witnesses for trial, we explained that

> Rule 4.04(A) of the Uniform Rules of Circuit and County Court states: "Absent special circumstances the court will not allow testimony at trial of an expert witness who was not designated as an expert witness to all attorneys of record at least sixty days before trial." "While the end result . . . may appear to be harsh, litigants must understand that there is an obligation to timely comply with the orders of our trial courts." *Bowie* [*v. Montfort Jones Mem'l Hosp.*], 861 So. 2d [1037,] 1043 (¶16) [(Miss. 2003)]. As the circuit judge in this case expressed: "The Mississippi Rules of Civil Procedure are not advisory, and this Court's Orders are not advisory."

appellate courts cannot consider facts not in evidence or assume that certain evidence exists simply because one party proclaims it to be so. *See Rogers v. State*, 318 So. 3d 1192, 1196 (¶15) (Miss. Ct. App. 2023).

¶46. Although the Upchurches called Dr. Lewis at the start of their case-in-chief, they did so to elicit factual testimony about his care and treatment of Mary. Importantly, at no time during Dr. Lewis's initial questioning by the Upchurches' attorney or during the subsequent direct examination conducted by his own attorney was Dr. Lewis ever tendered as an expert witness by one of the parties or accepted as an expert witness by the circuit court. Even so, at one point during Dr. Lewis's direct examination, his attorney asked if Dr. Lewis had complied with the overall standard of care in treating Mary and, more specifically, if Dr. Lewis had conformed with the standard of care with regard to the medical equipment he had available for Mary's surgery. Dr. Lewis's attorney then began to ask about Dr. Lewis's own personal experiences and success in performing prior surgeries similar to Mary's procedure.

¶47. As previously discussed, after reviewing the record, we cannot find where Dr. Lewis was ever designated or accepted as an expert witness who was permitted to testify beyond the actions he took and the observations he made during his care and treatment of Mary. *See Kronfol*, 283 So. 3d at 1178 (¶38). The inclusion of Dr. Lewis's name on the pretrial order as a fact and expert witness whom his attorneys planned to call cannot overcome these omissions and validate his inadmissible testimony. We therefore conclude that any expert witness testimony Dr. Lewis provided as to the applicable standard of care was improper.

*Buckley v. Singing River Hosp.*, 146 So. 3d 365, 373-74 (¶25) (Miss. Ct. App. 2013).

Moreover, as discussed, even a properly accepted expert witness may "not establish [the] national standard of care" through his own personal preferences and experiences. *Est. of Northrop*, 9 So. 3d at 387 (¶13). In addition, we conclude that the improper admission of Dr. Lewis's expert testimony adversely affected not only "a substantial right" of the Upchurches but also "the final result of the case . . . ." *Bell*, 287 So. 3d at 961 (¶53).

¶48. While the dissent contends that the Upchurches failed to assert any error pertaining to Dr. Lewis's improperly admitted expert testimony, the matter is actually raised within their very first issue. As phrased in the Upchurches' appellate brief, "The Expert, Factual, and Physical Evidence Overwhelmingly Proved" that the Boston Scientific device Dr. Lewis used was incompatible with Mary's preexisting St. Jude device. As part of their appellate argument, the Upchurches included a chart to establish the lack of expert proof from Dr. Lewis and the substantial expert proof they provided. In addition, the Upchurches repeatedly assert on appeal that "Dr. Lewis failed to present competent factual or expert testimony" at trial. We therefore find this issue was not only thoroughly briefed in written submissions but also raised during oral argument before this Court.

¶49. As the Upchurches contend, other than Dr. Lewis's own self-serving statements regarding his compliance with the applicable standard of care, he presented only the testimony of Dr. Neely for the jury's consideration. Although Dr. Neely initially opined that Dr. Lewis complied with the applicable standard of care in treating Mary, he later acknowledged that he did not perform the type of surgery Mary had and that not knowing whether two types of systems are compatible before starting surgery "[c]ould be" a deviation

24

from the standard of care. Dr. Neely also acknowledged that Dr. Lewis's own pre-surgical note about his consultation with the Upchurches seemed to indicate that Dr. Lewis was unsure if Mary's St. Jude leads would be compatible with the Boston Scientific Precision Spectra battery.

¶50. In contrast to Dr. Lewis's evidence, the Upchurches elicited testimony from Dyess, a Boston Scientific medical-device sales representative, who stated that he never recommended using a Boston Scientific battery with other manufacturers' equipment to any patients or physicians. The Upchurches also called Boston Scientific's designated corporate representative, Nageri, who repeatedly testified that an adapter was needed to connect the Boston Scientific Precision Spectra battery to Mary's existing St. Jude leads. Finally, the Upchurches presented two expert neurosurgeons, who not only testified that an adapter was necessary to successfully connect Mary's existing St. Jude equipment to the new Boston Scientific battery, but also that Dr. Lewis's decision to begin Mary's surgery without the proper equipment available breached the standard of care. Furthermore, the Upchurches' expert medical witnesses testified that Dr. Lewis's negligence in treating and caring for Mary resulted in the injuries she experienced.

¶51. Generally, when the issue on appeal involves nothing more than a battle of conflicting expert testimony, the appellate courts will decline to reverse a fact finder's determinations as to the weight and credibility to be assigned to each expert's testimony. *See Univ. of Miss. Med'l Ctr. v. Redd*, 412 So. 3d 341, 355-56 (¶¶41-42) (Miss. Ct. App. 2024). After viewing the evidence in the light most favorable to Dr. Lewis and Jackson Neurosurgery, though, we

cannot find that any credible, properly admitted evidence contradicted the Upchurches' substantial fact and expert testimony showing that Dr. Lewis operated on Mary without the appropriate medical equipment available to him and that this decision not only breached the standard of care he owed to Mary but also caused her injuries. As a result, we conclude that no legally sufficient evidence could support the jury's verdict finding Dr. Lewis was not negligent. We therefore reverse the circuit court's order denying the Upchurches' motion that they were entitled to JNOV due to the insufficiency of the evidence supporting the verdict.

¶52. In reversing a decision due to the legal insufficiency of the evidence, we often render a verdict in favor of the party seeking judgment as a matter of law. *See Est. of Walker v. Hall*, 331 So. 3d 553, 565 (¶38) (Miss. Ct. App. 2021). "[W]e also have the authority to remand the case to the trial court" for a new trial. *Id.* at (¶¶38-39). Upon consideration, we find the latter avenue more appropriate, and we therefore reverse and remand this case for a new trial consistent with this opinion.

## II. Dr. Lewis and Jackson Neurosurgery's Appeal

¶53. In their consolidated appeal, Dr. Lewis and Jackson Neurosurgery contend that they were permitted to designate additional documents for inclusion in the appellate record and that the circuit court should have assessed the costs of the amended record designations to the Upchurches. Dr. Lewis and Jackson Neurosurgery assert that the circuit court erred by assessing the costs for their amended appellate record designations to them rather than to the Upchurches. We review an "order to pay for the supplemental record . . . for abuse of

26

discretion." *In re City of Oxford*, 142 So. 3d 401, 404 (¶11) (Miss. 2014).

¶54.    "Mississippi Rule of Appellate Procedure 10 requires the appellant to designate the portion of the record he or she finds relevant and necessary[,] and, if the appellee feels additional portions of the record should be included, he or she may designate those." *Id.* at 407 (¶20); *see also* M.R.A.P. 10 cmt. (stating that "[t]he purpose of the Rule is to permit and encourage parties to include in the record on appeal only those matters material to the issues on appeal").  "The clerk and reporter shall prepare the additional parts at the expense of the appellant unless the appellant obtains from the trial court an order requiring the appellee to pay the expense."  M.R.A.P. 10(b)(4).

¶55.    As discussed, Dr. Lewis and Jackson Neurosurgery sought to include over forty additional documents in the appellate record, and the estimated costs of the designations exceeded $30,000.  In light of the deferential standard of review we apply to this issue, we recognize that the circuit court was in the best position to judge if their additional designations were relevant to the issues on appeal or would have placed unnecessary expense and burden on the Upchurches and this Court, respectively.  Although the circuit court determined that the costs of any additional appellate record designations should be assessed to Dr. Lewis and Jackson Neurosurgery, the circuit court also allowed Dr. Lewis and Jackson Neurosurgery to amend any additional designation as they wished.  Upon review, we find that the circuit court acted within its discretion.  We therefore affirm the circuit court's order assessing the costs of any amended designations to Dr. Lewis and Jackson Neurosurgery.

**CONCLUSION**

27

¶56. The Upchurches presented substantial testimony to support their claims that Dr. Lewis breached the standard of care owed to Mary when he performed her surgery with only a different manufacturer's medical device available and that his negligence caused Mary's injuries. Because no properly admitted expert's medical evidence contradicted the testimony of the Upchurches' expert medical witnesses, we conclude that there was insufficient evidence to support the jury's verdict in favor of Dr. Lewis and Jackson Neurosurgery. As a result, with regard to the Upchurches' appeal from the jury's verdict and the circuit court's order denying their motion for JNOV in appellate case number 2023-CA-01296-COA, we reverse and remand for a new trial consistent with this opinion. As to Dr. Lewis and Jackson Neurosurgery's consolidated appeal in appellate case number 2024-CA-00396-COA challenging the circuit court's order assessing to them the costs of any amended appellate record designations, we find no abuse of discretion and affirm.

¶57. **APPEAL NO. 2023-CA-01296-COA: REVERSED AND REMANDED. APPEAL NO. 2024-CA-00396-COA: AFFIRMED.**

**CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND LASSITTER ST. PÉ, JJ., CONCUR. WILSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, C.J. EMFINGER, J., NOT PARTICIPATING.**

**WILSON, P.J., DISSENTING:**

¶58. The majority holds that because Dr. Lewis was not formally tendered or accepted as an expert witness at trial, his testimony regarding the "standard of care was improper." However, *the plaintiffs never objected to Dr. Lewis's testimony on that ground or any other*. Therefore, any objection to Dr. Lewis's testimony is waived. *Evans v. City of Aberdeen*, 926

28

So. 2d 181, 185 (¶13) (Miss. 2006).[3]  Indeed, the issue is doubly waived because the

plaintiffs do not even raise that issue *on appeal*.  *Rosenfelt v. Miss. Dev. Auth.*, 262 So. 3d

511, 519 (¶27) (Miss. 2018) ("[W]e decline to address an issue that has not been briefed on

appeal. . . . Simply put, we will not act as an advocate for one party to an appeal." (quotation

marks omitted)).  Because the issue was not raised at trial, there is no basis for the majority

to hold that the trial court *erred* or *improperly admitted* Dr. Lewis's testimony.[4]  *See Moffett*

---

[3] *See also, e.g.*, *Ellis v. State*, 281 So. 3d 1092, 1101 (¶32) (Miss. Ct. App. 2019) ("Ellis asserts that the trial court erred by allowing Phyllis Crump, a forensic nurse practitioner, to testify as an expert witness because she was never offered or qualified as an expert.  Crump was not offered or qualified as an expert, but Ellis did not object to any of Crump's testimony on that ground.  Therefore, this issue is also waived." (citation omitted)); *Branch v. State*, 998 So. 2d 411, 414 (¶¶8-9) (Miss. 2008) (holding that although a witness "was never offered or qualified as an expert pursuant to Rule 702 of the Mississippi Rules of Evidence," the defendant "waived the right to appeal this issue" because he "failed to object to [the witness's] testimony pursuant to . . . Rule 702"); *Cowart v. State*, 910 So. 2d 726, 731 (¶22) (Miss. Ct. App. 2005) ("[The defendant] contends that Dr. Hayne was not formally tendered as an expert and that this failure to formally tender Dr. Hayne as an expert was reversible error. . . . Upon review of the record, we find that [the defendant] did not object to the failure to formally tender Dr. Hayne. . . . Therefore, [the defendant] has not preserved this argument for review, because he did not object to the failure to formally tender Dr. Hayne as an expert.").

[4] The trial court's pretrial order listed Dr. Lewis as a "will call" fact and expert witness for the defendants.  In addition, the defendants' appellate brief and response in opposition to the plaintiffs' motion to assess costs of the record on appeal (filed in the trial court) both state that they had designated Dr. Lewis as an expert in discovery.  Although the defendants' expert designations do not appear to be in the record on appeal, I would not fault the defendants for this omission.  The defendants had no reason to cross-designate their expert designation for inclusion in the record on appeal because the plaintiffs did not raise that issue at trial or in their statement of issues on appeal.  Moreover, "[i]t is an *appellant's* duty to justify his arguments of error with a proper record or the trial court will be considered correct.  The record on appeal must show such portions of the record of the trial court as are necessary for a consideration of the questions presented." *Pennington v. Dillard Supply Inc.*, 858 So. 2d 902, 903 (¶5) (Miss. Ct. App. 2003) (emphasis added) (citation omitted).

*v. State*, 49 So. 3d 1073, 1101 (¶91) (Miss. 2010) ("We will not hold a trial court in error on appeal for a matter not presented to it for decision." (quotation marks omitted)).

¶59.    "Because [the plaintiffs] made no objection at the trial court level to the [defendants'] failure to qualify [Dr. Lewis], [the plaintiffs] waived the issue," and the majority "improperly exclude[s] [Dr. Lewis's] testimony from its decision concerning the [weight and sufficiency of the evidence]." *Evans*, 926 So. 2d at 185 (¶13).  As this Court has stated,

> [i]f inadmissible testimony is received without objection, it becomes part of the evidence in the case and is usable as proof to the extent of its rational persuasive power. The fact that it was inadmissible does not prevent its use as proof so far as it has probative value. The inadmissible evidence, unobjected to, may be relied on in argument, *and alone or in part it can support a verdict or finding.  At the trial court level, a party may rely on the evidence to defeat a directed verdict motion; and on appeal, the party may use the evidence to uphold the legal sufficiency of the evidence to support a judgment.*

*Perkins v. State*, 392 So. 3d 690, 696 (¶11) (Miss. Ct. App. 2024) (brackets omitted) (quoting *Shaheed v. State*, 205 So. 3d 1105, 1110 (¶16) (Miss. Ct. App. 2016)).

¶60.    At trial, Dr. Lewis testified that he was a board-certified neurosurgeon with thirty-three years of experience and had performed the subject surgery numerous times.  Dr. Lewis further testified *without objection* that his treatment of Mrs. Upchurch and use of a Boston Scientific pulse generator conformed to the standard of care.  Because the plaintiffs never objected to Dr. Lewis's testimony, his testimony became part of the evidence in the case, and it was sufficient to create a jury question on the issue and to sustain the jury's verdict.

¶61.    In addition, Dr. Lewis testified that the St. Jude lead that had been implanted in Mrs. Upchurch seven years earlier was "bent and flimsy" and misshapen and could not be inserted into *any* pulse generator or adapter.  Dr. Narlin Beaty, testifying as an expert for the

30

plaintiffs, agreed that if "the lead was misshaped or damaged," it was "no longer appropriate to be implantable into any device." Accordingly, the options at that point in the surgery were to either end the surgery (leaving Mrs. Upchurch without a working spinal cord stimulator) or implant a new lead. The original St. Jude lead had been implanted "percutaneously" with a thin needle inserted into the epidural space around the spinal cord. However, it was not possible to implant a new percutaneous lead because too much scar tissue would have developed in the epidural space around the original lead for a new lead to be inserted in the same space. Therefore, implanting a new lead required a laminectomy, a surgical procedure that involves removing part of the lamina, which is the bony "roof of the spine." A laminectomy is a far more invasive procedure than a simple replacement of a pulse generator. Dr. Lewis testified that he obtained consent from Mr. Upchurch and then proceeded with a laminectomy to implant a new lead.

¶62. The plaintiffs' theory of the case is that Dr. Lewis breached the standard of care by attempting to use a Boston Scientific pulse generator with a St. Jude lead, which ultimately required him to replace the St. Jude lead with a Boston Scientific lead, which required a laminectomy, which caused Mrs. Upchurch's hematoma and partial paralysis. However, Dr. Lewis testified that due to its damaged condition, the St. Jude lead could not be inserted into *any* pulse generator or adapter. As noted, plaintiffs' expert Dr. Beaty agreed that a damaged lead cannot be inserted into any manufacturer's device. Accordingly, Dr. Lewis's testimony about the damaged condition of the original St. Jude lead provided an additional basis for the jury to return a verdict in favor of the defendants.

31

¶63. And although the majority finds "there was insufficient evidence to support the jury's verdict in favor of Dr. Lewis and Jackson Neurosurgery," it is important to remember that the defendants did not bear any burden of proof at trial. The plaintiff in a medical malpractice case bears the burden of proving each essential element of her claim. *Johnson v. Pace*, 122 So. 3d 66, 68 (¶8) (Miss. 2013). As the Mississippi Supreme Court has explained, "[a] plaintiff has the burden of proof, and must offer evidence that persuades the jury. The jury is not required to believe or trust the evidence submitted by the plaintiff, and is free to accept all, part, or none of the plaintiff's evidence. *A defendant is not required to prove or rebut anything.*" *Thompson v. Dung Thi Hoang Nguyen*, 86 So. 3d 232, 236-37 (¶13) (Miss. 2012) (emphasis added). The jury could have returned a defense verdict simply because it found that the plaintiffs' experts were not persuasive or credible. Therefore, the verdict and judgment should be affirmed.

¶64. Because Dr. Lewis's unobjected-to testimony provided a sufficient basis for reasonable jurors to find that the plaintiffs did not prove the essential elements of their claims, I respectfully disagree that the plaintiffs are entitled to any sort of partial judgment notwithstanding the verdict or a new trial. *See generally White v. Stewman*, 932 So. 2d 27, 32 (¶10) (Miss. 2006) (standard of review for denial of JNOV); *Bobby Kitchens Inc. v. Miss. Ins. Guar. Ass'n*, 560 So. 2d 129, 131-32 (Miss. 1989) (standard of review for denial of a new trial). The conflicts in the testimony were appropriately submitted to and resolved by the jury at trial and should not be reweighed by this Court on appeal. Accordingly, I

respectfully dissent.[5]

**BARNES, C.J., JOINS THIS OPINION.**

---

[5] Because the majority reverses the judgment in the plaintiffs' appeal (No. 2023-CA-01296-COA), the defendants' appeal regarding the cost of the record on appeal (No. 2024-CA-00396-COA) is moot. Because the judgment is reversed, *all* costs of the appeal will be taxed against the defendants anyway. *See* M.R.A.P. 36(a), (c). Therefore, there is no need to address the issue if the judgment is reversed.